Good morning. My name is Karen Frostrom and I represent the Plaintiff and Appellant Architecture Art. We have four claims that were dismissed on summary judgment. I'm going to briefly summarize the argument as to each and then gloss back over whatever may be of interest to the court. The first claim that should be reversed if any of the other three claims is reversed, the reason it was dismissed was the court found there was no independent wrong. If one of the other three claims is reversed, there is an independent wrong and that one should be reversed. Going to the other substantive claims, under equal protection they have a class of advertisers who wish to post graphic art, particularly during our July Comic-Con event, San Diego being the original Comic-Con venue, and these divide into two classes. One is the class of advertisers that are approved by Comic-Con. The other is the advertisers that were not. My client was not and as such she was cited in 2010, 2011, and 2012. The approved vendors only began to be cited in 2013 and there's an interesting thing that you should note about when those citations began is that they were cited as removed within 72 hours. Comic-Con lasts for 72 hours. So basically the city was saying take it down by the end of Comic-Con. We were never given that ability. We were discriminated against because we didn't pay the Comic-Con bounty that they demanded from approved advertisers. And there is a plethora of evidence in the record of the exchange between the city and Comic-Con saying, did you approve this? Is this okay? Take this down. We don't like it. Oh, here's Sony that didn't pay their bounty. The city says, wait, stop the process. There's a plethora of evidence in the record and your brief cites lots of emails and I read lots of emails and I didn't see evidence as part of the propositions asserted. So can you point me to more specific emails maybe that I can find what you say is there? Because I got to tell you, when I looked at them I found lots of things about locations and so forth, but I didn't see either the general or even the more specific allegations regarding bounties supported. If you look at particular ER 0478, the Comic-Con representative says the Sony event at the Gaslamp Park has hit a snag. They have stepped back on committing to pay. If they don't commit with us today, it can't happen. The city in my opinion. Permit for what? I'm sorry? Permit for what? The and this goes deeper into my argument and that is under the free speech argument that there are too many exceptions to the city's rules. The exception that they use is called a waiting for an answer to the question I posed. Yes, that question was issue. Permit for what? What is it they were seeking a permit for? That's all I'm asking. Okay, what the city issues is called temporary use permits. This is a unprecedented use of the temporary use permit and that... Is it a sign? No, they issued... It's not a sign. You're talking about use of space. Yes, but... I just want to know what kind of permit you're talking about. Temporary use permit. For use of a space. For use of a space. So it's not a sign. It shouldn't be a sign, but the city makes a list during Comic-Con of all of the temporary use permits that they've issued and if you look at the testimony from code compliance that we have in the record, if they are on the list for a temporary use permit, they're not cited for anything including the use of a sign. And so even though the temporary use permit should not be about the use of a sign, the city makes it a protection for the use of a sign. And so that... And where's that documented in the record? Or where is there evidence of that statement you just made? The temporary use permits are, for example, ER 1112 through 3, 4, 5, 1127, 1128, and 1143. And if you look at ER 0611, the testimony of Cynthia Benitez-Kadama, who is from the city, she's asked, what is your understanding within special events of what regulations are pertaining to signage in San Diego? And she says, pertaining to special events, we really wouldn't have a policy within special events regarding signage. Not in special events, no. And so these temporary use permits that issue, and if you look, example, at page 1112, it gives a list of everything that they're approving and it does not make a Even if there's a sign. And... Free to do whatever they want. Free to do whatever they want because they are part of Comic-Con, which is this revered event in San Diego. And they're given a lot of discretion. And that is... Now, is this property or location? City property? Or is it... City property is we... ER 1570 is a map that we put into the record that shows where the signs have gone up on city property. And the court below found that there was no evidence of what was on city property versus port property. And if you look at ER 1570, it shows you that we showed them exactly where the signs were going up on city property. And... Our signs, signs were also on city property. And when you get into the issue of signs and the free speech issue, it is our contention that under the Reed case, this case is subject to scrutiny. And the reason is that under the Reed case... The holding is... Off-site? Non-site? I'm sorry? The distinction between on-site advertising and off-site advertising? No, that's not our argument. Our argument is that the San Diego Ordinance, the central which is San Diego Municipal Code 142.1210. If you look at that section, which is the Governing Sign Ordinance, the focus is on copy. Copy means words. Words equals content. Under the Reed case, under page 2227, if the distinction is based on content and the court has to review the content in order to decide if it's a sign that's legal, then you're going on a content-based resolution. If you look at the very first section of 142.1210, it says copy regulations. Permitted or changeable copy on signs shall contain on-premises or public interest messages only. Let's look at one of the examples of the murals that my client put up. It's a golf advertisement. It has no words on it. It has the Nike Swish. That was one of the signs that was cited. There's no content on that sign. How can it fall within San Diego's regulations? What do you mean there's no content on that sign? There's a Nike Swish. That's not text. Copy is copy, which is what the sign ordinance uses. Is there anything that says content is limited to text? I mean, everybody recognizes the Nike Swish, and Nike's not putting it up there because it's pretty artwork. It's putting up with the Nike Swish. How is that not commercial speech? How is that not? Because the regulation in San Diego doesn't say commercial speech. It says permanent or changeable copy. Copy isn't a Nike Swish. Copy and the words have meaning. Copy means text. The words have meaning, but Swish does not? It's not copy. How do you define copy? When you put up a picture of a bottle of liquor that is the same bottle of liquor that you'll see on a shelf in a store, is there copy on that? When you put up the Swish, nobody thinks Swish. Everybody thinks Nike. Certainly. But we're looking at the San Diego sign ordinance and determining whether it's content-based. And when it entirely relies on the word copy, it's content-based because you have to read the words, and there have to be words. And so – Well, why does there have to be words? Is it because you interpret copy to require words? Because that's what copy means. Well, suppose I think copy means something broader than that. Nike didn't put that up there as a pretty picture. We don't contend that they did. We just are looking at – Why isn't the superimposed Swish copy? Why is it copy? I would come back to you. Because it's an extra message. It's not the pretty picture. It's a logo. It's something more than the pretty picture. It's a logo. Well, yeah. But is it copy as that term is understood in advertising? And that's why the San Diego signed ordinance is defective, because it relies on copy. Now, if I was looking at this Section A-1, and it said, Permanent or Changeable Copy Logos, Trademarks, Insignia, we'd be having a different conversation. But I'm looking at the ordinance that we're deciding here today, and the city who wrote this ordinance chose to make it rely on copy. And because they chose to make it rely on copy, they made this a content-based ordinance. And off-premises, on-premises, we're not making that distinction. We're saying, regardless of what it is, what do we have to look at to determine if it's a legal sign? And what the city says we have to look at is copy, which means we have to read the words, which means we have to consider the content, which under read requires strict scrutiny. Well, this court has said that commercial speech is subject to intermediate scrutiny. Except... That's subsequent to read. I have looked at the cases subsequent to read, and none of them have said that the content-based findings in read don't matter. And I've looked at, you know, Retail Digital Network, which didn't even mention read. I've looked at First Resort versus Herrera, which talks about the ideologically or the perspective of the speaker. And I would note that I'm now at the point where I wanted to reserve three minutes for rebuttal and request permission to reserve those three minutes. Thank you. Thank you. Good morning, Your Honors. Katherine Richardson on behalf of Defendant City of San Diego. May it please the Court. Essentially, the architecture appeal comes down to two claims that I believe the Court has already recognized. These signs were murals and exempt from the sign ordinance, and the city discriminated against architecture art because it favored Comic-Con-approved advertisers over architecture art in this pay-for-play scheme. Is there kind of a special relationship between the city and Comic-Con? No, Your Honor. I mean, other than Comic-Con. Well, the city doesn't want Comic-Con to leave San Diego, do they? Well, I don't think it wants Comic-Con to leave, but the question is. The largest convention annually in San Diego, is that right? I'm sorry? The largest convention each year in San Diego is Comic-Con, right? I would imagine it is, Your Honor. But there's no evidence in the record, or any evidence that I'm aware of, even outside the record, which would indicate that there is any kind of a special relationship or pay-for-play scheme between the city and Comic-Con. There appears to be some coordination between the city officials and Comic-Con. There is absolutely communication, Your Honor, because, of course, this is a huge event. Logistically, it's a huge event, and there needs to be coordination. But there's no evidence, and there's not any discrimination against architecture art and some Comic-Con-approved advertisers. In fact, there's no evidence in the record of any Comic-Con-approved advertisers being, first of all, any advertisers approved by Comic-Con to begin with, but then no evidence that they've been given any special treatment or favoritism. Well, as I understood from the record, that she points out that, okay, there's architecture art, and she points to various signs or murals or whatever they are where she was cited, and then she points to other signs throughout the city that weren't hers but were similar. She says these weren't cited, right? She does, Your Honor, and there's a couple of issues on that. First of all, there's no evidence that those other advertisers were not cited, and there's no evidence, even more importantly, that any of those other signs were approved by the city. At most, what architecture art has tried to show is that there was lax enforcement, which this Court's already determined is not evidence of discrimination. And if you look at all of the evidence that architecture arts put in front of the Court, there was one of their signs, the Heineken sign, that was cited in 2012 during Comic-Con. That's the only sign that I've been able to locate in all of the evidence that's been produced of an architecture art sign that was cited during Comic-Con prior to 2013, well, prior to 2014, actually, because none of their other signs were cited during Comic-Con. So the argument that somehow they were being discriminated against in favor of Comic-Con advertisers is not borne out by the evidence. Is your statement reflecting that the other citations were outside the time period of Comic-Con? Is that the point you're making? It is, Your Honor. In 2011, there was one warning that was issued to architecture art for their Rayman sign. And what month was that? That was actually issued in August, August 10th of 2011. When's Comic-Con? July, the last week of July. In 2012, there was a Destination LA sign that was actually allowed to remain after they deleted the LA, the Los Angeles words because then it qualified as a mural. The Alaska Airlines sign was also permitted in 2012 after they painted out Alaska Airlines because, again, that was advertising. And then a warning was given to Newcastle in November of 2012. Were these citations and warnings the first two? Were they at a time period during or adjacent to Comic-Con? They were not, Your Honor. The Alaska Air was October. The Jack Daniels was given a citation in November of 2012. The Newcastle warning was given in November of 2012. The Destination LA where they agreed to paint out LA, that was in June of 2012. So the only citation during Comic-Con was Heineken, which was July 24th of 2012. And in 2013, none of the citations or warnings were issued during Comic-Con. Nike was in February of 2013. Naked Juice was February 28th. That was a warning only. And then the Shock Top, Blue Moon, and Michelob Ultra permits that were revoked or not issued were in May. And if I could just briefly address a couple of the items that counsel referred to. There was the e-mail record number 0478, which is the e-mail saying, Uh-oh, there may be a problem. Please do not issue the permit yet. The deposition of the city employee, Carolyn Wormser, confirmed, and it's part of the record, that any nonpayment to Comic-Con by Sony would not dictate the issuance of a permit in this case. And again, we are talking about a temporary use permit for an event at a particular location. And if you look at page 1112 of the record, which also was cited by counsel, that is a letter confirming a temporary use permit being approved by Civic San Diego. And number five of the conditions or limitations of that temporary use permit says, There shall be no off-premises signs advertising the event. So there was a limitation to signage in that temporary use permit. What's the relationship between the Civic organization and the city and Comic-Con? There's like this third entity? Civic San Diego is a separate entity. It's not the city. They oversee the center city, for lack of a better term. They, for instance, can issue this temporary or approve a temporary use permit. What's its status under California law? What is it? It takes the place of the redevelopment agency. So it has some administrative. Is it a governmental authority? It's not. It's not a part of the city. It's its own separate entity. It has authority to issue a temporary use permit? It can approve the temporary use permits. But that's completely separate from the signage that we're talking about in this case, Your Honor. We're talking about signage that is subject to the municipal code of the city of San Diego. Well, counsel just said that got a temporary use permit. That was okay for the signs, too. That's not correct, Your Honor. And again, because, first of all, the municipal code applies to all of the city of San Diego. And this temporary use permit specifically says that no off-premises signs advertising the event are permitted. So the use permit is just for what? For some space? It is. In this case, for instance, it was allowing Dodge and Viacom to host a special event. Something that takes place at Comic-Con? Not at Comic-Con, but at a different location. Okay. And this was at 6th Avenue. And every event is still required. In the special use permits, for instance, those specifically say in them that you have to comply with all of the codes, all the municipal codes and other laws. And in this case, Miss Anderson or Architecture Art, all of the signs violated the municipal code. The temporary use permit is really just a red herring because it didn't apply to any of her signs. She didn't apply for a temporary use permit for any of her signs. So it really is irrelevant to the analysis in this case. Architecture Art claims that there were these temporary use permits and it allowed everyone to do whatever they wanted. There's no evidence of that. There's no evidence that there was a temporary use permit that was issued that allowed one of these offending signs. Is there any evidence in the record that any other advertisers with either murals with copy or off-premises advertisements were not cited during, whether it was right around Comic-Con or during Comic-Con? That's, no. There's not evidence of that. The evidence that Architecture Art has put forward is that there were these other signs, and so therefore the city approved them or permitted them. But that's not what the evidence shows. What the evidence shows is that there may have been offending signs that were up, but that doesn't mean that they were approved. And even there, what Architecture Art has put forth in their evidence, the best that I can make of it, is in 2010 there was a Red Faction sign and a Resurrection sign, one on the Omni, one at Petco. In 2011, a Spider-Man sign, a Monstergeddon sign. In 2012, a Total Recall sign. And in 2013, Game of Thrones. So you have one or two signs that would not be in compliance with the city ordinances, but that's not to say that they were permitted, first of all. And second of all, that's not showing some pervasive exception to the sign ordinance. Or that, I would submit, doesn't even show lax enforcement when you've got one or two signs up with no evidence of being cited. Did you want to respond to her first free speech argument? I'm sorry? Did you want to respond to her free speech argument that she just made? Yes. About copy? Yes, I do. She cites, first of all, I think this is the first time that argument's been raised, but second of all, that's just the very first line of the sign ordinance, basically. The mural exception, the on-premises, off-premises exception, those are in the statutes. Those are separate ordinances themselves. And so those specifically lay out what is or is not permitted. And the mural exception is not vague. It's very clear. You can't have advertising. You can't have logos. You can't have trademarks. The on-premises, off-premises exception has been repeatedly upheld as content neutral. And I would submit that Reed does not apply in this case because, again, we're dealing with content neutral ordinances. Reed did not address commercial speech. And even the concurring justices said that the strict scrutiny would probably not apply or it wouldn't apply to a content neutral or on-site exception. But even if strict scrutiny applies in this case, the city has put forth a substantial interest for why these exceptions are an important state interest. Okay. Okay. I think your time is up. Thank you, Your Honors. First of all, I would take significant issue with the contention of the city that there were one or two signs up during Comic-Con. Just look at the map that we put in the record that I referenced during my original argument. This city is awash with signs during Comic-Con. What's the appendix reference on that? The reference for the map? Yeah. Is ER 1570. And it does not show one or two signs. As to the city's contention that there was no evidence that no one else was cited, if you look at ER 1364, we served requests for production for any of the citations related to the signs. 1379, dated 2013, was the first one that was produced. As to whether we were ever cited more than once during Comic-Con, we were cited eight times during Comic-Con, and that is in the record at ER 725 through 735 and ER 739 through 740. Furthermore, I would contend that the very fact that many of the citations my client received were outside of the timeline of Comic-Con shows that the city makes so many exceptions during Comic-Con that if you put up something that they consider a sign outside of Comic-Con, you're going to get cited because you're not part of Comic-Con. You've lost me. I don't follow you. It just seemed to me that the opposite conclusion follows from what you said. Just run through that again. Yes. If the city's contention is that, well, we didn't do anything wrong because a lot of our citations were not during July, during the Comic-Con month, well, then what you're saying is that the city only cites people who post signs, and we don't agree with that. Outside of the Comic-Con period, then, again, you're showing discrimination against people who are not participating in Comic-Con. And council referenced the mural exception, which is also in Section 1410, and said, well, it's not vague and it's not content-based. Well, if you look at it, it says, when painted graphics are installed on other than a wall or fence or contain copy advertising symbols, lettering, trademarks, or other references to the premises, products, or services, only, only the actual copy area is considered. Thank you. Thank you, council. We appreciate your arguments this morning. Thank you both. Matters submitted.
judges: Parker, Paez, Clifton